## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | JAN 1 5 2025 |
| | § | |
| Plaintiff, | § | Nathan Ochsner, Clerk of Court |
| | § | |
| v. | § | Crim No. 4:12-cr-00272-7 |
| | § | |
| RUSTY EUGENE DUKE, | § | |
| | § | |
| Defendant. | § | |

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO
## 18 U.S.C. § 3582(C)(1)(A) AND FIRST STEP ACT OF 2018

COMES Defendant, RUSTY EUGENE DUKE ("Duke"), appearing *pro se,* and

in support of this memorandum would show as follows:

### I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is

limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582.

The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is

extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is

black-letter law that a federal court generally "may not modify a term of

imprisonment once it has been imposed." *Id.* However, Congress has allowed an

exception to that rule "in the case of a defendant who has been sentenced to a term

of imprisonment based on a sentencing range that has subsequently been lowered by

the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. PROCEDURAL HISTORY

### A.    Procedural Background

On February 20, 2013, a grand jury in United States District Court for the Southern District of Texas, Houston Division, returned an eighteen (18) Count Second Superseding Indictment, charging Duke and thirty-five other co-defendants. See Doc. 469.[1] Count 1ss charged Duke with Conspiracy to Participate in Racketeering Activity, in violation of 18 U.S.C. § 1962(d). *Id.* Count 17ss charged Duke with Attempted Murder of Jason Head, in violation of 18 U.S.C. §§ 1959(a)(5) and 2. *Id.* The Second Superseding Indictment also contained a Notice of Criminal Forfeiture Allegation pursuant to 18 U.S.C. §§ 924(d)(1) and 1963, 21 U.S.C. § 853, and 28 U.S.C. § 2461(c). *Id.*

---

[1]    "Doc." refers to the U. S. District Court for the Southern District of Texas, Houston Division, Docket Report in Criminal Number 4:12-cr-00272-7, which is immediately followed by the Docket Entry number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

On August 13, 2014, a Re-arraignment was held and Duke entered a guilty plea as to Count 1ss of the Second Superseding Indictment pursuant to a Written Plea Agreement. See Doc. 978.

On December 9, 2014, Duke was sentenced to a term of 216 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Doc. 1281.

On December 22, 2015, Duke filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which was denied on August 10, 2009. See Doc. 1453.

On June 9, 2016, an Evidentiary Hearing was held pursuant to Duke's § 2255 Motion. See Doc. 1489.

On June 16, 2016, the District Court dismissed Duke's § 2255 Motion with prejudice and denied a certificate of appealability ("COA").  See Doc. 1492.

On April 9, 2020, Duke filed a Second § 2255 Motion. See Doc. 1545.

On April 14, 2020, the District Court issued a Memorandum Opinion and Order and Final Judgment dismissing without prejudice Duke's *pro se* Second § 2255 Motion as an unauthorized second or successive application. See Docs. 1546, 1547.

On May 15, 2020, Duke filed a Notice of Appeal re: dismissal of his Second § 2255 Motion. See Doc. 1549.

3

On May 5, 2021, the United States Court of Appeals for the Fifth Circuit

("Fifth Circuit") denied Duke's Motion for COA. See Doc. 1578.

## B.    Statement of the Relevant Facts

### 1.    Offense Conduct

The government and Duke, through the advise of his counsel, agreed and

stipulated to the following facts:

> At least as of 2009, and continuing to the date of the Second
> Superseding Indictment, Duke was an active member of the ABT in the
> Dallas/Fort Worth area.
>
> On or about July 27, 2011, Duke aided and abetted ABT gang member
> Jason Yates, aka "Rowdy" ("Yates") to kill fellow ABT gang member
> Jason Head ("Head"). Duke wanted retribution against Head because he
> believed Head was responsible for attempting to steal drugs from him
> and, in an attempted robbery, pointed a gun at Duke's father. In
> furtherance of the conspiracy, Yates and a female companion confronted
> Head at his home in the Dallas/Fort Worth area. Upon entering the
> residence, Yates pointed a handgun at Head's face and pulled the
> trigger. After an apparent misfire, Yates attempted to shoot Head two
> more times, but the handgun misfired on each occasion. A struggle
> ensued over the weapon, but Yates was able to secure the gun away
> from Head. Yates and his female companion then fled the scene. Yates
> obtained a different handgun and before he could return and kill Head,
> he was arrested on unrelated charges.
>
> On multiple occasions from 2010, and continuing to the date of the
> Second Superseding Indictment, Duke conspired with fellow ABT gang
> members and others to sell methamphetamine. During this period, Duke
> possessed with the intent to distribute at least 350 grams of
> methamphetamine. See Doc. 978 at 11-12.

2.     Plea Proceeding

On August 13, 2014, Duke appeared before the district court with his trial counsel Robert A. Jones ("Counsel") and pleaded guilty to Count 1ss of the Second Superseding Indictment, Racketeering Conspiracy, under the provisions of a Written Plea Agreement. See Doc. 978. Under the terms of the Rule 11(C)(1)(c) of the Federal Rules of Criminal Procedure Plea Agreement, in exchange for pleading guilty to Count 1ss of the Second Superseding Indictment and waiving his right to file a direct appeal of his conviction and sentence, Duke's sentence would capped at 216 months' imprisonment, he would be able to challenge his case in any post-conviction motion and the government would dismiss Count 17ss of the Second Superseding Indictment. *Id*. The case was referred to the Probation Office for the preparation of the PSR.

3.     Presentence Report Calculations and Recommendations

The Probation Office prepared Duke's PSR on November 4, 2014. The 2014 edition of the Guidelines Manual has been used in this case. See PSR ¶ 55. Count 1ss charges conspiracy to participate in a racketeering enterprise, namely, multiple acts involving murder, arson, kidnapping, robbery, assault, and narcotics trafficking. USSG § 2E1.1, directs that where there is more than one underlying offense, treat each underlying as if contained in a separate count of conviction. The object offenses for this defendant's conduct are as follows: Racketeering Act (hereinafter "RA") 1-

5

Attempted Murder of Jason Head; and RA 2 - Conspiracy to distribute methamphetamine. Both object offenses are treated as "Pseudo Counts". The racketeering acts cannot be grouped together as they involve separate victims and are specifically excluded from the grouping principles under the aggregate provisions at USSG § 2D1.2. Therefore, each of the racketeering acts will be illustrated, followed by the multiple group adjustment. See PSR ¶ 56. RA 1: Attempted Murder of Jason Head calls for a Base Offense Level of 33, pursuant to USSG § 2A2.1(a)(1). See PSR ¶ 57. Two (2) levels were added because Duke was deemed an organizer, leader, supervisor, or manager in this case, pursuant to USSG § 2B1.1(c). See PSR ¶ 60. The PSR calculated Duke's Adjusted Offense Level to be 35. See PSR ¶ 62. RA 2: Conspiracy to Distribute Methamphetamine calls for a Base Offense Level of 30 because the offense involved at least 50 grams but lees than 150 grams of methamphetamine (actual), pursuant to USSG § 2D1.1(c)(5). See PSR ¶ 63. The PSR calculated the Greater Adjusted Offense Level to be 35. See PSR ¶ 72. Another one (1) level increase in offense level was added for resulting to a Combined Adjusted Offense Level of 36 pursuant to USSG § 3D1.4. See PSR ¶ 74. However, Duke was deemed to be a career offender, therefore, his offense level was increased to 37, pursuant to USSG § 4B1.1 See PSR ¶ 74. The PSR calculated Duke's Total Offense Level to be level 37. See PSR ¶ 78. Duke's total criminal history points totaled to 23,

establishing a Criminal History Category of VI. Of note, Duke is a career offender; therefore, the Criminal History Category is VI. See PSR ¶ 94. Based on a Total Offense Level of 37 and a Criminal History Category of VI, the guideline imprisonment range is 360 months to Life. See PSR ¶ 128.

### 4.    Sentencing Proceeding

On December 9, 2014, a Sentencing Hearing was held before Judge Sim Lake.No Doc. Entry. At sentencing, the Court sentenced Duke to a term of 216 months' imprisonment, followed by a five-year term of supervised release. See Doc. 1281. The Court also ordered a payment of a Mandatory Special Assessment Fee of $100. *Id.* No direct appeal was filed in this case.

### 5.    Postconviction Procceding

On December 22, 2015, Duke, through counsel, timely filed a § 2255 Motion. See Doc. 1453.

In the that motion, Duke raised one ground of ineffective claim of counsel. He contended that his Counsel was ineffective at the plea stage because he failed to properly explain the consequences of pleading guilty to Count one, the racketeering charge, and failed to explain to him that his total offense level could be affected by the attempted murder charged in Count 17ss, and thus, his plea was not voluntary and knowing. See Doc. 1453-1 at 6-8.

7

On June 9, 2016, an evidentiary hearing was held pursuant to Duke's § 2255 Motion. See Doc. 1489.

On June 16, 2016, the district court dismissed Duke's § 2255 Motion with prejudice and also denied a certificate of appealability ("COA"). See Doc. 1492. The court held that Duke had not satisfied either the performance prong or the prejudice prong under the Strickland test, he has not met his burden of showing that his guilty plea was influenced by ineffective assistance of counsel. Therefore, the Plea Agreement was valid and enforceable. *Id.*

On April 9, 2020, Duke filed a *pro se* Second § 2255 Motion. See Doc. 1545. In that motion, Duke contended that he is entitled to relief because his sentence was improperly enhanced under the "career offender" provision found in § 4B1.1 of the United States Sentencing Guidelines because racketeering is not a "crime of violence." Duke conceded that this is his second request for relief under § 2255, and he sought permission to pursue a successive challenge to his sentence under the line of cases established by *United States v. Johnson*, 135 S. Ct. 2551 (2015), including: *Welch v. United States*, 136 S. Ct. 1257 (2016), *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *United States v. Davis*, 139 S. Ct. 2319 (2019). Duke maintained that he was "actually innocent" of the sentence enhancement that he received under the career-offender guideline and that the attorney who represented him during the

8

evidentiary hearing held on his first motion under § 2255 was constitutionally ineffective for failing to argue that the enhancement was erroneous under *Johnson*.

On April 14, 2020, the district court issued a Memorandum Opinion and Order and Final Judgment dismissing without prejudice Duke's *pro se* Second § 2255 Motion as an unauthorized second or successive application. See Docs. 1546, 1547.

## III. DISCUSSION

As a preliminary matter, Duke respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally. See *United States v. Kayode*, 777 F.3d 719 (5th Cir. 2014) (*Pro se* pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

### A.    Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Duke's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family

9

circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.    Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

### 2.    Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States Sentencing Commission hereby submits to the Congress the following amendments to the Guidelines Manual and the reasons therefor. As authorized by such section, the

Commission specifies an effective date of November 1, 2023, for these amendments:

(b)    *Extraordinary and Compelling Reasons.–* Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

    (1)    *Medical Circumstance of the Defendant.–*

        (A)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

        (B)    The defendant is—

            (i)    suffering from a serious physical or medical condition,

            (ii)    suffering from a serious functional or cognitive impairment, or

            (iii)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

        (C)    The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D) The defendant presents the following circumstances—

   (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

   (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

   (iii) such risk cannot be adequately mitigated in a timely manner.

(2) *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3) *Family Circumstances of the Defendant.*—

(A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C)    The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D)    The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4)    *Victim of Abuse.*— The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

(A)    sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

(B)    physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

14

(5)    *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6)    *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

This amendment responds to, among other things, the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a sentence reduction upon a defendant's own motion. Previously, a court was authorized to do so only upon the motion of the Director of the Bureau of Prisons ("BOP"). Congress amended the law for the express purpose, set forth on the face of the enactment, of "increasing the use" of sentence reduction motions under section 3582(c)(1)(A). First Step Act § 603(b).

15

### 3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as ... improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4. Duke Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

Duke has filed a request for compassionate release to the Warden at USP Canaan, however, he did not receive any response yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Duke's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

### B. Duke Has "Extraordinary and Compelling Reasons" For Compassionate Release

The principles of Compassionate Release allow for Duke's early release. As discussed above, the principles for release are no longer limited to BOP guidelines; federal courts have the power to determine what constitutes extraordinary and compelling circumstances.

17

1.    Duke's Current Conditions of Confinement and Health
       Conditions

Duke, age 42, suffers from incurable, progressive disease, from which Duke

will never recover if left untreated, to wit: Ankylosing Spondylitis.

**Facts:**

*Ankylosing Spondylitis*. Ankylosing Spondylitis (AS) is a type of progressive
arthritis that leads to chronic inflammation of the spine and sacroiliac joints.
It can also affect other joints and organs in the body, such as the eyes, lungs,
kidneys, shoulders, knees, hips, heart, and ankles. However, AS primarily
affects the axial skeleton, including the ligaments and joints.

This disease causes stiffness, aching, and pain around the spine and pelvis. The
disease can eventually lead to a total fusion of the spine. This occurs when the
vertebrae (spinal bones) actually grow together fusing the spine due to
calcification of the ligaments and discs between each vertebrae. If the vertebrae
fuse together, the spine is robbed of mobility, leaving the vertebrae brittle and
vulnerable to fractures.

Another unique feature of AS is that it appears to be genetic. A specific gene,
called the HLA-B27 gene, is present in many people who have the disease.
Eighty to ninety-five percent of people who have AS also have the HLA-B27
gene. This does not mean that if you have the gene you will automatically get
AS. In fact, even though around eight percent of Americans have this gene,
only about one percent actually has ankylosing spondylitis. However, if you
are suspected of having AS, a blood test to determine if you have the HLA-B27
is useful. In the early stages of AS, it is sometimes hard to make a definite
diagnosis. If you have the symptoms of AS AND you have the HLA-B27 gene,
it is likely that the diagnosis of AS is correct.

There is not yet a cure for AS. However, there are effective treatment options
that can relieve pain and improve your condition.

18

The general approach is a conservative treatment plan that includes: medication, physical therapy, and exercise. Surgery may be necessary at some point to treat problems caused by AS in the spine and other joints of the body.

In this case, Duke undergone several tests to address his condition. In fact, Duke has been assessed by specialists due to severe pain caused by AS. Currently, Duke is required to receive injectable medication [Humira] to manage his medical issue. Although the medication was recommended to treat his AS, Humira can cause some long-term side effects. For example, the drug can cause the growth of new cancers or may cause existing tumors (masses of cancerous tissue) to grow. Also, it could weaken Duke's immune system and be vulnerable to severe infections. Duke desperately wanted to alleviate the pain caused by his disease and so, all possible resort which could lessen his burden he would do so. However, other than the medication, Duke also needs supplements and physical therapy which was not offered in the BOP. These are the resources Duke could easily get outside prison and could even improve his daily living condition. Duke's medical issue was unattended due to lack of access to proper medical treatment and good environment– which is essential to attain full recovery– these factors could prevent the recurrence of Duke's medical concerns. The failure to render the appropriate medical care puts Duke's medical condition in greater danger. It is clear that, the BOP has acted with Deliberate Indifference towards a serious medical need. Thus, Duke should be given with the

necessary medical treatment to address his health issues.

Hence, it is appropriate for Duke to be released into an environment where he and his loved ones can control and direct his medical care. It is important for all of us to remember that convicted criminals are sent to prison as punishment—not for punishment. People who are severely debilitated or are in the midst of dying are usually no longer a threat to society, and there is not a compelling social advantage to keeping them in prison.

C.    **The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.**

Section 3582(c) states that a district court cannot modify a term of imprisonment once it has been imposed except that, in any case:

> The court, upon motion of the Director of the Bureau of Prisons, or the defendant, pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> > (i)    extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least five extraordinary and compelling reasons warranting such a reduction, discussed as follows:

1.  First Step Act— Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

This responds to the First Step Act of 2018, Pub. L. 115–391 (Dec. 21, 2018) ("First Step Act" or "Act"), which contains numerous provisions related to sentencing, prison programming, recidivism reduction efforts, and reentry procedures. Specifically, the sentencing reform provisions of the Act (1) amended the sentencing modification procedures set forth in 18 U.S.C. § 3582(c)(1)(A) to allow a defendant to file a motion seeking a reduction in the defendant's term of imprisonment under certain circumstances; (2) reduced certain enhanced penalties imposed pursuant to 21 U.S.C. § 851 for some repeat offenders and changed the prior offenses that qualify for such enhanced penalties; (3) broadened the eligibility criteria of the "safety valve" provision at 18 U.S.C. § 3553(f); (4) limited the "stacking" of certain mandatory minimum penalties imposed under 18 U.S.C. § 924(c) for multiple offenses that involve using, carrying, possessing, brandishing, or discharging a firearm in furtherance of a crime of violence or drug trafficking offense; and (5) allowed for retroactive application of the Fair Sentencing Act of 2010. Revisions to the Guidelines Manual may be appropriate to implement the Act's changes to 18 U.S.C. § 3582(c)(1)(A).

The 814 Amendment had also revised the list of "extraordinary and compelling reasons" in §1B1.13 in several ways.

The sixth amendment added a new category ("Unusually Long Sentences") providing that if a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances. See USSG §1B1.13 (b)(6).

In this case, Duke had already served his sentence for more than 10 years. Under the 814 Amendment, this is considered to be an unusually long and harsh sentence. Thus, this presents as an "extraordinary and compelling reasons." See *United States v. Salliey*, CRIMINAL ACTION RDB-10-0298 (D. Md. Feb. 13, 2023), the Court concludes that the length of Salliey's sentence, the substantial time he has already served, and his strong evidence of rehabilitation are collectively sufficient. Salliey was sentenced to a term of 204 months, or seventeen years, for possession of a firearm. (See Judgment 2.) The record reflects that he has already served a

substantial portion of that sentence, and that he is scheduled to be released in just over two years.

2.    <u>Methamphetamine Drug Purity Is Not a Proxy for Culpability</u>

Methamphetamine, commonly known as "meth", is a highly addictive and potent stimulant drug that can have devastating effects on individuals and communities. It was made a Schedule II controlled substance in 1970. In light of the serious harm caused by methamphetamine, the criminal justice system has taken a strong stance against methamphetamine trafficking. When methamphetamine dealers are arrested they face stiff penalties designed to punish the offender and deter recidivism. In determining appropriate punishment, courts must consider a range of factors, including the weight of the controlled substance, a defendant's prior criminal history, adjustments such as the defendant's role in the drug organization, and other relevant circumstances. However, one factor – the purity of methamphetamine – has been given disproportionate emphasis in determining punishment when purity is not a proxy for culpability.

The United States Sentencing Guidelines use a two-tiered system to set the base offense level for prosecuting a methamphetamine distribution case. One tier establishes a base offense level for high-purity methamphetamine known as "actual

methamphetamine" while the other tier sets the level for "mixtures" which are substances containing a detectable amount of methamphetamine. As you might expect, defendants prosecuted for distribution of actual methamphetamine get longer sentences than defendants caught with a methamphetamine mixture. The intention of this sentencing disparity is to target the most serious offenders, but its effect is to punish all offenders with the most severe penalties without regard for an individual's actual role in the offense. This highlights the need for reform in drug sentencing laws and a more nuanced approach to addressing drug-related offenses.

Take for example a Defendant charged with Possession with Intent to Distribute 4.5 kilograms of actual methamphetamine versus a Defendant charged with distributing the same amount of a mixture of methamphetamine. Under the Statute, crimes involving pure methamphetamine trigger a ten-year mandatory minimum penalty at 50 grams, while crimes involving a methamphetamine mixture trigger a ten-year mandatory minimum penalty at 500 grams. This is commonly referred to as the 10:1 purity ratio from the mandatory minimum penalties contained in 21 U.S.C. § 841(b)(1). With no prior criminal history, the first Defendant with actual methamphetamine has a base offense level of 38 (235 – 293 months of imprisonment) while the second Defendant with a mixture has a base offense level of 32 (121 – 151 months of imprisonment). That is a 9 ½ year difference at the low end of the guideline

24

range or a 94 percent increase in the sentence due solely to the purity of the methamphetamine.

The concept of drug purity plays a critical role in drug-related offenses. The reason behind increasing a defendant's sentence based on drug purity is rooted in the fact that controlled substances are often cut and diluted with other substances as they pass from wholesaler to regional distributors to street-level dealers. In devising the Guidelines, the Sentencing Commission took into account that a defendant in possession of a controlled substance of very high purity is an indication of the defendant's significant involvement in the criminal organization and proximity to the source of the drugs. "The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution." *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017). However, the assumption made by the Sentencing Commission regarding the correlation between methamphetamine purity and a defendant's criminal role is not supported by real-world evidence. In fact, this assumption potentially leads to serious miscarriages of justice. As *Ibarra-Sandoval* remarked, "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." 265 F. Supp. 3d 1249 at 1255.

25

As the court in *Ibarra-Sandoval* discussed, "The average purity of methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving methamphetamine as a kingpin or leader, even though that simply is not true." Id. at 1255–56. In *United States v. Bean*, 371 F. Supp. 3d 46, 52–53 (D.N.H. 2019) the court stated, "In the current market, the purity of methamphetamine does not necessarily reflect a defendant's role in the distribution chain. Low-level street dealers are just as likely as so-called 'kingpins' to have access to, and be charged with distribution of, extremely pure methamphetamine. In effect, then, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true."

Trends have shown that the price per pure gram of methamphetamine has steadily decreased while the purity has increased. From 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and for the third quarter of 2016, averaged 93.5 percent pure. See, *United States v. Nawanna*, 321 F.Supp.3d 943, 951 (N.D. Iowa 2018). "Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution." *United States v. Siddoway*, 2023 WL

2246705, at *3 (D.Idaho, 2023). Today, a low-level street dealer would be distributing methamphetamine that would be similar in purity to the methamphetamine that came from the top of the supply chain.

The *Nawanna* court found that "because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability." 321 F.Supp.3d at 951. The *Nawanna* court noted "that there was once some truth to the Commission's assumption that large quantities are associated with high purities, because methamphetamine was cut as it worked its way down to the street-level dealer or user, but that is no longer the case." *Id*. The *Nawanna* court concluded that "because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive." *Id*. at 954.

The current Guidelines for methamphetamine have proven to be ineffective in achieving its intended goal of targeting high-level drug distributors. Instead, they recommend harsher penalties for all individuals involved in the distribution of methamphetamine, regardless of their level of involvement. The Guideline's reliance on drug purity as a factor for determining an individual's role within the organization

27

is outdated and irrelevant in today's drug landscape. As a result, the Guidelines recommend more severe punishments for all offenders based on the drug's purity without taking into account each participant's role in the offense.

The Federal Statute, 21 U.S.C. § 841(b)(1), should be amended to abolish arbitrary minimum sentences ascribed to actual methamphetamine. Minimum statutory sentences restrict a court's ability to fashion a sentence that takes into account a defendant's unique relevant circumstances and role in the offense. Furthermore, the United States Sentencing Guidelines should be updated to reflect that purity is no longer a proxy for culpability. The Guideline for methamphetamine mixtures should be applied regardless of the purity of the methamphetamine possessed.

### 3. Refusal to Follow the Actual (and Ice) Methamphetamine Guideline Based on Policy Disagreement

Two judges in the Northern District of Iowa recently have announced that they disagree with on policy grounds, and no longer will follow, the marijuana equivalency called for in the Sentencing Guidelines when imposing sentences in cases involving actual methamphetamine and ice.

The Sentencing Guidelines distinguish between a methamphetamine mixture and actual/pure methamphetamine or ice, which it defines as methamphetamine that

is at least 80% pure, treating actual/pure methamphetamine or ice ten times more harshly than a mixture of marijuana. One gram of actual (pure) methamphetamine or ice has a marijuana equivalency of 20 kilograms whereas one gram of a methamphetamine mixture has an equivalency of 2 kilograms. The ratio has its roots in 21 U.S.C. 841(b)(1). Comment 27(c) to U.S.S.G. § 2D1.1 offers the only explanation of the Commission's view on the relevance of purity to the appropriate sentence, asserting that purity "is probative of the defendant's role or position in the chain of distribution" and that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."

As Chief Judge Leonard T. Strand and District Judge Mark W. Bennett explain in *United States v. Harry*, 313 F. Supp. 3d 969 (N.D. Iowa 2018) and *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018), respectively, there is no empirical basis for the 10-1 ratio and, because nearly all methamphetamine trafficked is substantially pure, purity is not an accurate proxy for culpability and it makes little sense to enhance virtually all methamphetamine defendants' sentences on the basis of purity. Both judges indicated that they therefore will apply the only the 2 kilogram marijuana equivalency even in cases involving actual/pure methamphetamine or ice.

29

As with the crack/powder cocaine disparity, District Courts have the discretion to disagree with the Guidelines on policy grounds and find that a particular Guideline should not applied in a given case. In this case involving actual/pure methamphetamine or ice, it is essential to note that there is no empirical basis for applying the 10-1 ratio and that, because purity is not actually a proxy for culpability, the court should not apply it in this case. In *U.S. v. Robinson*, No. 3:21-CR-14-CWR-FKB-2 (S.D. Miss. Dec. 23, 2022), the Guidelines use drug purity as a proxy for culpability. But national experience suggests that is no longer true for methamphetamine. The DEA data show that most methamphetamine confiscated today is "pure" regardless of whether the defendant is a kingpin or a low-level addict. See *United States v. Hendricks*, 307 F. Supp. 3d 1104, 1108 (D. Idaho 2018) ("Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution."); *Carrillo*, 440 F. Supp. 3d at 1154 ("Since the Guidelines first took effect, unusually pure methamphetamine has become increasingly more common.").

Given the on-the-ground reality in methamphetamine cases, the better way to determine culpability is to examine all of the circumstances of the defendant's case and life -- seeing the defendant as a "whole person," as the Supreme Court just instructed in *Concepcion*. 142 S. Ct. at 2395. There are sentencing enhancements

available for leaders, organizers, or managers of criminal enterprises.   If the

defendant's case warrants, those enhancements should be applied.  In the context of

methamphetamine though, purity is no longer probative of the defendant's

culpability. In conclusion, Robinson's motion was granted by the District Court and

Judge Reeves, ordered that his base offense level will be 26.

Thus, in light of *Robinson*, the Court should consider and resentence Duke

based only on more than 350 grams of methamphetamine and not for at least 50

grams but less than 150 grams of methamphetamine (actual).

4.    Erroneous   Application   of   the   Career   Offender
Enhancement

In this case, the District Court erred in determining that Duke was a career

offender within the meaning of U.S.S.G. § 4B1.1(a), which provides:

A defendant is a career offender if (1) the defendant was at least
eighteen years old at the time the defendant committed the instant
offense of conviction; (2) the instant offense of conviction is a felony
that is either a crime of violence or a controlled substance offense; and
(3) the defendant has at least two prior felony convictions of either a
crime of violence or a controlled substance offense.

Duke was over 18 years of age when he committed this offense, and it was a

"controlled substance" offense within the meaning of U.S.S.G. § 4B1.1(a). His

sentence was therefore subject to being enhanced under the "Career Offender"

Guidelines provision, § 4B1.1, if he had "at least two prior felony convictions of

either a controlled substance offense or a crime of violence. "The PSR construed U.S.S.G. § 4B1.2, which defines a "controlled substance offense" and a "crime of violence."

Duke was sentenced as a career offender because before he was convicted in federal court of the present offense, Duke had at least two prior felony convictions of either a crime of violence or a controlled substance offense, enumerated as follows:

1)   12/21/1999 (Docket No. F-9915184-RW): Burglary of A Habitation (Felony), in 363 Judicial District Court, Dallas County, TX. On February 9, 2001, Duke was sentenced to 10 years' imprisonment. On April 19, 2005, Duke was paroled; and

2)   08/29/2006 (Docket No. CR-06-485522-B): Ct 1 - Trafficking Offenses (F4) and Ct 3 - Possessing Criminal Tools (Felonies) in Court of Common Pleas, Cleveland, OH. On September 8, 2008, Duke pleaded guilty and he was sentenced to a total term of 17 months' imprisonment.

Here, Duke contests that he had at least one felony conviction of either a crime of violence or a controlled substance offense, explained as follows:

*Trafficking Offense Is Not A Controlled Substance Offense Under Career Offender Guideline*

Following the Supreme Court's holding in *Mathis v. United States*, 136 S.Ct. 2243 (2016), Duke Ohio Drug Trafficking conviction can no longer qualify as "controlled substance offense" because: (1) The definition of "sale" sets forth varying

32

means of committing the O.R.C. § 2925.03(A)(1) crime of knowingly "sell" or "offer to sell" a controlled substance. Given that the offense of knowingly sell or offer to sell a controlled substance offense is broader than USSG § 4B1.2(b)'s definition of a "controlled substance offense," and given that the Ohio Drug Trafficking statute criminalizes "gift" or "offer to gift" while the federal definition does not include gift or offer to gift, any prior conviction under 2925.03(A)(1) can no longer qualify as a controlled substance offense. (2) The O.R.C. § 2925.03(A)(2) offense of "knowingly prepare for shipment, ship, transport, delivery, prepare for distribution, or distribute a controlled substance, when the offender knows or has reasonable cause to believe a controlled substance is intended for sale or resale by the offender of another person" does not set out alternative elements, but rather alternative means of committing one offense of drug trafficking. In addition, the analysis above, as it relates to § 2925.03(A)(1), it equally applicable to the elements "sale" or "resale." § 2925.03(A)(2) criminalizes "gift" or "re-gift" while the federal definition does not. Thus, any prior conviction under § 2925.03(A)(2) can no longer qualify as a controlled substance offense.

To determine whether a prior conviction should be considered a controlled substance offense, we start with the analytical mode constructed by the United States Supreme Court in *Taylor v. United States*, 495 U.S. 575 (1990); see also, *United*

33

*States v. Robinson*, 330 Fed. Appx. 33, 34 (6th Cir. 2009) (endorsing a categorical approach to statutory language, concluding that offenses containing an element of intent to manufacture, import, export, distribute, or dispense qualifies as enhancers pursuant to USSG § 4B1.2(b)).

Under this "categorical approach," an adjudicator "asks whether the elements of the crime of conviction sufficiently match the elements of the generic offense, while ignoring, the particular facts of the case. See *Taylor*, 495 U.S. at 600-601. "Elements" are the "constituent parts" of a crime's legal definition --the things the "prosecution must prove to sustain a conviction." Black's Law Dictionary 634 (10th ed. 2014). Facts, by contrast, are real, world things– extraneous to the crime's legal requirements. In particular, they need neither be found by a jury nor admitted by a defendant. *Id*. at 709.

The comparison of elements that the categorical approach requires is straight forward when a statute sets out a single (or "indivisible") set of elements to define a single crime. The court then lines up that crime's elements alongside those of the generic offense and see if they match. See *Taylor*, 495 U.S. at 591.

The Supreme Court has also approved a variance of the categorical approach, labeled the "modified categorical approach," for use when a prior conviction is for violating a so-called "divisible statute." *Id*. That kind of statute sets out one or more

34

elements of the offense in the alternative. *Id.* If one alternative matches an element in the generic offense, but another does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, from the record of a prior conviction to determine what crime, with what elements, a defendant was convicted of before comparing that crime's elements to those of the generic offense. See e.g., *Descamps v. United States*, 133 S.Ct. 2276, 2279 (2013); *Shepard v. United States*, 544 U.S. 13, 26 (2005). The modified categorical approach then permits the court to "do what the categorical approach demands: Compare the elements of the crime of conviction .. with the elements of the generic offense.

The modified categorical approach does not apply, however, when the crime of which the defendant was convicted has a single indivisible set of elements. *Id.* at 2282. And when a defendant was convicted of a so-called "indivisible" statute - i.e., one not containing alternative elements - that criminalizes a broader swath of conduct than the relevant generic offense," that conviction cannot serve as a qualifying ACCA predicate offense. *Id.* at 2781-82.

The Supreme Court's recent holding in *Mathis* [which Duke relies upon] clarified that the modified categorical approach applies only to statutes that list "multiple elements disjunctively," and not to those that merely "enumerated various factual means of committing a single element." *Id.* at 2249. (emphasis added). The

35

decision in *Mathis* instructs that there is a difference between alternative elements of an offense and alternative means of satisfying a single element. *Id.* at 2250. To illustrate the difference, if "a statute requires the use of a 'deadly weapon' as an element of a crime and further provides that the use of a "knife, gun, bat, or similar weapon' would all qualify," application of the modified categorical approach would be inappropriate because the statute "merely specifies diverse means of satisfying a single element of a single crime." *Id.*

"The first task for a sentencing court faced with an alternatively phrased statute is to determine whether its listed items are ELEMENTS or MEANS." *Id.* at 2256. If the statute lists various means of committing a single element, then the court must stick to the categorical approach. However, if the statute lists alternative elements, then courts may apply the modified categorical approach to determine the actual offense underlying the defendant's conviction. *Id.* Suppose, for example, that one count of an indictment and correlative jury instructions charge a defendant with burgling a "building, structure, or vehicle"– thus reiterating all the terms of Iowa's law. That is as clear an indication as any that each alternative is only a possible means of commission, not an element that the prosecution must prove to the jury beyond a reasonable doubt. *Id.* at 2557.

Following these standards, Duke's Ohio Drug Trafficking conviction can no longer serve to escalate his base offense level under USSG § 4B1.1. Ohio's Drug Trafficking statute is not a valid predicate, and the finding that Duke's prior conviction qualified as "controlled substance offenses" constitutes a violation of his rights to due process.

The term 'distribute' means to "deliver" a controlled substance. 21 U.S.C. § 802(11).

Ohio Revise Code § 2925.03 TRAFFICKING OFFENSES states:

(A)    No person shall knowingly do any of the following:

    (1)    Sell or offer to sell a controlled substance or a controlled substance analog.

    (2)    Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance, or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender of another person. *Id.*

See also, *MaDougald v. Warden*, 2014 U.S. Dist. LEIS 96688 (6th Dist. 2014).

The definition of "sale" has the same meaning as in O.R.C. § 3719.01(AA). See O.R.C. § 2925.01(A); *Mendieta-Robles v. Gonzalez*, 226 Fed. Appx. 564, 568 (6th Cir. 2007); *Grier v. Richland County Corr. Inst.*, 20.12 U.S. Dist. LEXIS 152801 (6th Dist. 2012). Indeed, O.R.C. § 3719.01(AA) defines "sale" extremely broadly to include:

37

"delivery, barter, exchange, transfer, gift, or offer thereof, and each transaction of these natures made by any person, whether as principle, proprietor, agent, servant, or employee." *Id.*

Indeed, O.R.C. § 2925.03 is a "broad" statute. Therefore, Duke does not dispute that *Shepard* documents can be used to determine whether he violated § 2925.03(A)(1) or (A)(2). Here, Duke violated both § 2925.03(A)(1) and (2). With regard to § 2925.03(A)(1), the relevant question is whether the definition of "sell or offer to sell" in § 3719.01 (AA) in conjunction with § 2925.03(A)(1) sets forth different offenses, such that selling or offering to sell a controlled substance by "barter, gift, or offer thereof" it is a separately and distinct offense from selling or offering to sell a controlled substance or a controlled substance analog to another? Here, Duke contends that the various definitions of "sale" in § 3719.01(AA) of the Ohio Revised Code are not elements of separate offenses but are various means of committing the offense of "sell or offer to sell a controlled substance or a controlled substance analog." Indeed, according to *Mathis*, "a statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means). *Id.* at 2256. Here, the state court always charges only the elements of § 2925.03(A)(1) which is "No person shall knowingly sell or offer to sell a controlled substance or a controlled substance analog." Therefore, the listed definitions of "sale"

merely specifies diverse means of satisfying a single element of a single crime.

Accordingly, Duke respectfully submits that his prior conviction under O.R.C. § 2925.03(A)(1) is no longer a controlled substance offense under the Guidelines because the offense of knowingly sell or offer to sell a controlled substance or a controlled substance analog is broader than the Guidelines definition of a controlled substance offense. The Ohio statute criminalizes "barter and gift" while the federal definition does not include such offenses. See also, i.e., *Mathis*, supra. ("State statutes that provide alternative means for committing an element of a crime do not qualify defendants for sentencing enhancements..."); *United States v. Hinkle*, No. 15-10067 (5th Cir. 2016) (concluding that because the "delivery" element of Hinkle's crime of conviction criminalizes a "greater swath of conduct than the relevant [Guide-lines] offenses," Hinkle's conviction for knowingly delivery of heroin is not a controlled substance offense under the Guidelines).

Here, Duke also violated § 2925.03(A)(2), "knowingly prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance analog when the offender knows or has reasonable cause to believe that the controlled substance or controlled substance analog is intented for sale or resale by the offender of another person." Therefore, one of the relevant questions is whether the listed alternatives are MEANS or ELEMENTS?

As previously explained, the example in *Mathis* provides:

"Suppose, for example, that one count of an indictment ... charge a defendant with burgling a "building, structure, or vehicle" -- thus reiterating all the terms of Iowa's Law. That is as clear an indication as any that each alternative is only a possible MEANS of commission, not an ELEMENT that the prosecution must prove beyond a reasonable doubt."

*Id.* at 2257.

Duke submits that the threshold inquiry– ELEMENTS or MEANS is easy in this case. Here, Duke's indictment reiterates all the terms of § 2925.03(A)(2). Moreover, the Sixth Circuit Court of Appeals and this court's decisions definitively answers the question, as for they all reveal that Ohio's indictments reiterates all the terms of § 2925.03(A)(2). See, e.g., *Shinholster v. Bradshaw*, 2014 U.S. App. LEXIS 24993 (6th Cir. 2014); *U.S. v. Wright*, 43 Fed. Appx. 844, 852-53 (6th Cir. 2002); *Ratleff v. Warden Chillicothe Corr. Inst.*, 2016 U.S. Dist. LEXIS 71338 (6th Dist. 2016). Hence, because the elements of O.R.C. § 2925.03(A)(2) are broader than USSG § 4B1.2(b)'s definition of a controlled substance offense, Duke prior conviction under § 2925. 03(A)(2) cannot give rise to an enhanced sentence under § 4B1.1.

In addition, because the element "sale" as defined in O.R.C. § 3719.01 (AA) criminalizes a greater swath of conduct [i.e., "gift and/or barter") than the elements

of 481.2(b)'s definition of controlled substance offense; This mismatch of elements means that Duke's conviction under § 2925.03 (A)(2) involving intent[ed] for "sale or resale" is not a controlled substance offense under the Guidelines.

Accordingly, following *Mathis*, Ohio's Drug Trafficking statute § 2925.03 (A)(1) and (2) is no longer categorically a "controlled substance offense."

### *Count 1ss: Conspiracy to Participate in Racketeering Acts*

Since Duke's original sentencing, the Fourth Circuit has held that conspiracy under 21 U.S.C. § 846 is not a "controlled substance offense" . . . See *United States v. Norman*, 935 F.3d 232, 237-38 (4th Cir. 2019). Duke argues that the reasoning in *Norman* extends to the conclusion that a RICO conspiracy involving underlying drug offenses similarly cannot be a "controlled substance offense" under USSG § 4B1.2(b).

Specifically, the *Norman* court reaffirmed the principle that although USSG § 4B1.2 extended to certain conspiracy offenses, "'an overt act is an element of the generic definition of 'conspiracy' as incorporated into § 4B1.2." *Id.* at 237 (quoting *United States v. McCollum*, 885 F.3d 300, 308 (4th Cir. 2018)). In contrast, "'conspiracy' under § 846 does not require an overt act." *Id.* at 238 (citing *United States v. Shabani*, 513 U.S. 10, 11 (1994)). Thus the Fourth Circuit concluded that "a 'conspiracy' conviction under § 846 is a categorical mismatch to the generic crime

of conspiracy enumerated in § 4B1.2(b)" and could not be the subject of a career offender enhancement. *Id.* at 239.

Moreover, in *United States v. Havis*, 927 F.3d 382 (6th Cir. June 19, 2019), the Sixth Circuit held that the U.S. Sentencing Guidelines' definition of "controlled substances offenses" does not include attempt crimes because the Sentencing Commission overstepped its authority when it expanded the applicability of U.S.S.G. § 4B1.2 without subjecting the rule to congressional review or notice or comment. *Id.* at 386-87. Also, the Court conducted Defendant Michael Powell's resentencing hearing on February 5, 2020. During that hearing, the Court concluded that Powell was no longer a career offender based on recent precedent from the Sixth Circuit. The Court also informed the parties that it would supplement its ruling in writing of which was found in *Havis*. Given the same logic espoused in *Havis*, the Sixth Circuit would expand its reasoning regarding attempt crimes to include conspiracy crime as well. Accordingly, Powell's cocaine conspiracy did not qualify as a "controlled substance offense." As a result, the Court did not sentence Powell utilizing the career offender enhancement. See *United States v. Powell*, 2021 U.S. App. LEXIS 12177, 2021 fed App. 219N (6th Cir.), 2021 WL 1578913 (6th Cir. Ohio, Apr. 22, 2021).

The Sentencing Guidelines provide for an increased sentence if the defendant qualifies as a career offender. Two key components for a defendant to qualify as a

career offender include whether: (1) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (2) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. USSG § 4B1.1. The career offender guideline defines a controlled substance offense, in relevant part, as an offense under federal or state law that prohibits the manufacture, import, export, export, distribution, or dispensing of a controlled substance or the possession of a controlled substance with intent to manufacture, import, export, distribute, or dispense. USSG §4B1.2(b). The application note to § 4B1.2 provides that a controlled substance offense includes offenses of aiding and abetting, conspiring, and attempting to commit such offense. USSG §4B1.2(b), comment. (n.1).

*Mathis, Norman, Havis,* and *Powell,* are substantially relevant in regard to Duke's arguments, making clear indication that the interpretation of statutes by district courts are contrary to the Congress' intent. Further, the statutes are too ambiguous to secure a conviction. Since, Duke's trafficking offense and RICO conspiracy should not be considered as a "controlled substance offense" pursuant to USSG § 4B1.2(b). The same applies to Duke's circumstance.

Accordingly, Duke should be resentenced without the career offender enhancement.

43

5.     <u>Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct</u>

With respect to the need to avoid unwarranted sentencing disparities, Duke urges the Court to consider the sentences of recent compassionate release grants:

    i.     *United States v. Clark, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020)*
- Quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at *6.

   ii.     *United States v. Brooks, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020)*
- Quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in USSG § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

Also, the Sixth Circuit says conspiracy to distribute drugs is not a "controlled substance offense." In *Jackson*, Defendant pleaded guilty to drug trafficking. At sentencing, the district court found that he was a career offender under § 4B1.1 based in part on his prior conviction under federal law for conspiracy to distribute a controlled substance. The Sixth Circuit held that conspiracy does not qualify as a "controlled substance offense" under § 4B1.2 and remanded. *U.S. v. Jackson*, __ F.3d __ (6th Cir. Apr. 22, 2021) No. 18-5676.6.

The Fourth Circuit finds federal crack conspiracy is not a "controlled substance offense." A defendant convicted of possession of a firearm by a felon is subject to an enhanced offense level under § 2K2.1(a)(4) if he has a prior conviction for a "controlled substance offense," which includes conspiracy. Defendant had a prior federal conviction for conspiracy to possess crack with intent to distribute. The Fourth Circuit held that because federal conspiracy does not require proof of an overt act, it is not a "controlled substance offense" as the guidelines use that term. *U.S. v. Norman*, __ F.3d __ (4th Cir. Aug. 15, 2019) No. 18-4214.

Duke is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act and grants of

compassionate releases based on the need to avoid unwarranted sentencing disparities, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

Duke essentially argues that the unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendants who—those being sentenced today under a different sentencing structure and/or received a reduction in sentence based on the need to avoid unwarranted sentencing disparities. Duke' sentence in 2014 is now disparate relative to Defendant's who were sentenced after December 21, 2018 and post-*Havis* decision.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2,

2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a

disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

Under 18 U.S.C. § 3582(c)(2), to modify Duke's sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Finally, Duke asserts that the increase in the calculation of his sentencing range based on career offender enhancement, resulted in a longer sentence. If so, this could be deemed a miscarriage of justice.

## V. <u>CONCLUSION</u>

For the foregoing reason, Duke prays that this Court grant his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A), the First Step Act of 2018, and U.S.S.G. Amendment 814, and resentence Duke to time served or any other relief that the Court deems appropriate in this case.

Respectfully submitted,

Dated: January 13, 2025

RUSTY EUGENE DUKE
REG. NO. 15714-078
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472
Appearing *Pro Se*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2025, a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 was sent via First Class U. S. Mail, postage prepaid, to Jason B. Smith, Assistant U.S. Attorney at U.S. Attorney's Office, 1000 Louisiana Street, Suite 2300, Houston, TX 77002.

RUSTY EUGENE DUKE

RUSTY EUGENE DUKE
REG. NO. 15714-078
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472

January 13, 2025

Mr. Nathan Ochsner
Clerk of Court
U.S. District Court
Southern District of Texas
Houston Division
P. O. Box 61010
Houston, TX 77208

RE:   *Duke v. United States*
       Crim No. 4:12-cr-00272-7

Dear Mr. Ochsner:

Enclosed please find and accept for filing Movant's Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018. Please submit this document to the Court.

Thank you for your assistance in this matter.

Sincerely,

RUSTY EUGENE DUKE
Appearing *Pro Se*

*Encl. as noted*



**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL** ®

USPS TRACKING® #

9505 5104 4802 5013 0595 41

123

RDC 03   0 Lb 8.60 Oz

$10.45

HOUSTON, TX 77070
JAN 13, 2025

S2224K50284T-08

FROM:

United States Courts
Southern District of Texas
**FILED**

JAN 15 2025

Nathan Ochsner, Clerk of Court

Register Number: 15714-078
Rusty E. Duke
USP CANAAN
U.S. PENITENTIARY
P.O. BOX 300
WAYMART, PA 18472

TO:

Mr. Nathan Ochsner
Clerk of Court
U.S. District Court
Southern District of Texas
Houston Division
P.O. Box 61010
Houston, TX 77208

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International®. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.